United States District Court
Southern District of New York
---------------------------------------------
United States of America,

     -against-                               25 Cr. 73 (MMG)

Terry Brooks,

                    Defendant.
---------------------------------------------

**TERRY BROOKS'S SENTENCING SUBMISSION**

Federal Defenders of New York
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

Jonathan Marvinny

*Of counsel*

To:   Jay Clayton, Esq.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn: Kevin Grossinger, Esq.
          James Mandilk, Esq.

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

September 8, 2025

By ECF

Honorable Margaret M. Garnett
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re:   United States v. Terry Brooks, 25 Cr. 73 (MMG)**

Dear Judge Garnett:

As Terry Brooks approaches 60, he is embarrassed to find himself imprisoned at MDC awaiting federal sentencing. After some misspent younger years that eventually saw him serve over a decade in New York State prison, he was released in his early 40s and vowed to leave his criminal conduct firmly in the past. For a long time he succeeded: He worked a series of well-paying, dependable jobs, became a good father and partner, and stayed out of trouble for about 14 years.

By 2023, however, Mr. Brooks felt crushed beneath the weight of multiple stressors, including the deaths of several beloved family members and a debilitating court battle with his ex-wife over their teenage daughter. He sought psychiatric treatment but soon stopped taking his medications and began using hard drugs instead. In November 2023 he was suffering from insomnia, depression, and anxiety. In that state he committed the serious offenses—a shooting and possession of multiple firearms and ammunition—for which this Court will sentence him.

Mr. Brooks makes no excuses and understands that he is due a prison term. He has pled guilty to two counts of § 922(g)(1) after reaching a plea agreement with the Government that contained a Guidelines range of 87 to 108 months' imprisonment. But Probation places him at 121 to 151 months because of robbery convictions from the late 90s that elevate both his criminal history and offense level. We are constrained to agree with Probation's calculation, but demonstrate below that the Guidelines substantially

Honorable Margaret M. Garnett                    September 8, 2025
United States District Judge                         Page 2 of 10

Re:   United States v. Terry Brooks
        25 Cr. 73 (MMG)

overrepresent Mr. Brooks's criminal history. In any event, the Guidelines are of course
merely advisory, and here call for a sentence far in excess of what is appropriate. After
considering the equities, the Court should sentence Mr. Brooks to 72 months. That sentence
would be sufficient, but not greater than necessary, to accomplish all legitimate sentencing
goals.

**Mr. Brooks's background**

      Terry Brooks was born in Maryland in 1966 and was the youngest of eight children.
His parents separated when he was five and afterward he split time between his mother's
home in Baltimore and his father's home in New York City. Both parents loved him, but Mr.
Brooks remained particularly close with his mother, whom he admired for raising so many
children with such little support.

      Mr. Brooks had a happy childhood in many senses, but there were dark aspects as well.
The constant shuttling between his parents' homes made him sometimes feel like he lacked
their full attention. ███████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████ He says the experience changed his life: "It was
painful and more problems started in the house because of it." Letter of Terry Brooks (Ex.
A).

      Mr. Brooks was alienated and wayward as an adolescent. He turned to the streets for
guidance with unfortunate, if predictable, results. He fell in with the proverbial wrong crowd
and began experimenting with hard drugs and engaging in petty thefts in and around
Baltimore. He cycled through various institutions—first juvenile detention and foster homes,
then prison. His behavior escalated in the years after and at 29 he was arrested in Queens
after committing multiple robberies. He was sentenced to 8 to 16 years in New York State
prison.

      After his release from prison in 2009, Mr. Brooks, then 43 years old, determined to
turn his life around. He was open to any job that would have him and began cleaning
bathrooms and offices, often working at two or three locations in the same day. He soon
landed a permanent maintenance job at a grocery store in Astoria, Queens. He then
transitioned to a more remunerative maintenance job at a building in Brooklyn, where he

Honorable Margaret M. Garnett                    September 8, 2025
United States District Judge                          Page 3 of 10

Re:    United States v. Terry Brooks
          25 Cr. 73 (MMG)

earned $60,000 a year. Then, in 2015, he became a certified process server and eventually
supported himself by working in that field, first at a law firm and then on his own. The job
could be dangerous—people generally didn't appreciate being served with court papers—but
he enjoyed the work and earned around $50,000 a year.

        On the personal front, in 2009 he had a daughter, J███, with his now-ex-wife, Claudia
Goodwin. He has been a good father to J███, who is now 16, though problems between
him and Ms. Goodwin would eventually complicate their relationship. When J███ was
growing up he saw her every week and was very close with her. He even started a fatherhood
group with his friends who also had children that he called "Better Fathers." Under Mr.
Brooks's leadership, the men supported each other through the challenges and successes of
fatherhood.

        In 2020 Mr. Brooks entered a romantic relationship with Ady Ben-Israel, a clinical
psychologist. They remain committed partners and she has supported him through his
current legal troubles. Ms. Ben-Israel speaks adoringly of Mr. Brooks. In particular she has
seen up close the love he has shown J███. She says he is a "devoted and doting father," and
recounts how, in 2020, "J███ was able to spend Christmas with Terry and she organized an
at-home karaoke night. Terry's apartment was equipped with a bed, extra clothing, and
ample games that J███ enjoyed. Fatherhood changed his life." Letter of Ady Ben-Israel
(Ex. B).

**Mr. Brooks's offenses**

        Mr. Brooks achieved many good things after his release from prison in 2009. But by
2023 he was in a dark place. He was in the midst of a debilitating family court battle with his
ex-wife that had tainted his relationship with J███. That situation, along with the recent
deaths of his father and sister, was taking a severe psychological toll. He was already prone
to depression—he had long struggled with suicidal ideation and had made multiple attempts
to take his life by ingesting pills. In late 2022 he began seeing a psychiatrist to address the
various stressors in his life and was formally diagnosed with major depressive disorder,
anxiety, and insomnia, and prescribed psychotropic medications including Seroquel, Lexapro
(escitalopram), lorazepam, and trazodone. *See* Weill Cornell Psychiatric Records, Mar. 14,
2023 (Ex. C) (noting that Mr. Brooks was "not sleeping well" and suffering "with mood and
anxiety [symptoms] in the context of psychosocial stressors around work, legal difficulties

Honorable Margaret M. Garnett                                    September 8, 2025
United States District Judge                                         Page 4 of 10

Re:   United States v. Terry Brooks
      25 Cr. 73 (MMG)

with ex-wife re: daughter, and vocational stressors. He is [confronting] some recent losses of dad and sister now with new impending loss of another sister.").

The medications helped for a while but Mr. Brooks felt sluggish and disoriented and so soon stopped taking them. Insomnia left him unable to sleep at night and when he grew tired during the day he often turned to crack to stay awake. He had also begun smoking K2, a particularly dangerous drug. In November 2023 he was decompensating and staying in a hotel room in the Bronx with an acquaintance. He was using drugs and attempting to outrun his insomnia, anxiety, and depression, but was failing miserably.

On the evening of November 12, Mr. Brooks went to a nearby smoke shop where he had an interaction with a man who approached him as he (Mr. Brooks) stood at the counter paying for his items. Mr. Brooks believed the man was considering robbing him and left the store. As shown on surveillance footage, Mr. Brooks exited the shop and walked toward his car. The man then exited the shop himself and began walking toward Mr. Brooks. He appeared to call out to Mr. Brooks, at which point Mr. Brooks turned to face him. They appeared to exchange words, and then, as the man walked away, Mr. Brooks fired a single shot at him. The bullet did not hit the man but hit a woman standing near the shop entrance instead, who suffered injuries.

In addition to that shooting, Mr. Brooks is also responsible for buying gun parts online in 2023 and 2024, and for possessing and storing multiple firearms, parts, and ammunition in various locations in New York City. Mr. Brooks accepts responsibility for and deeply regrets all of this criminal conduct.

**The Court should sentence Mr. Brooks to 72 months' imprisonment.**

### 1.    The Guidelines substantially overrepresent Mr. Brooks's criminal history.

To begin, the Court should find that the Guidelines substantially overrepresent Mr. Brooks's criminal history. He pled guilty with the expectation—after entering a plea agreement with the Government—that he would be at offense level 29 and in Criminal History Category I, for a Guidelines range of 87 to 108 months. But he now finds himself at offense level 30 and in Criminal History Category III, for a Guidelines range of 121 to 151 months, all because of convictions he sustained almost 30 years ago. Indeed, he receives six

Honorable Margaret M. Garnett                    September 8, 2025
United States District Judge                     Page 5 of 10

Re:   United States v. Terry Brooks
      25 Cr. 73 (MMG)

criminal history points for four robbery sentences imposed on the same day: June 19, 1996.
PSR ¶¶ 80–83. Those sentences also elevate his base offense level from 20 to 22 under
§ 2K2.1(a)(3).[1]

       Those sentences—concurrent indeterminate sentences of 8 to 16 years—stemmed
from offenses that were part of one continuous robbery spree that occurred from
December 1 to 21, 1995, when Mr. Brooks was 29 years old. *Id.* None of the offenses were
separated by an intervening arrest—he was first arrested on December 22, 1995, and
committed no robbery after that date. *Id.* ¶¶ 80–87. He was originally released from custody
on those sentences in 2006, but they earn points because his parole was revoked and he was
reincarcerated for about 10 months in 2009. That revocation brings the sentences just barely
within the 15-year window in § 4A1.1(a), given that his current offenses occurred in 2023
and 2024.

       In the 14 years between 2009 and 2023 Mr. Brooks did not sustain even a single arrest,
much less a conviction. Instead, as shown above, he used that time to work a series of
meaningful jobs, be a good father to his daughter J████, and become a contributing partner
and member of his community. In short, he endeavored to leave his earlier criminal behavior
firmly in the past. But by the arbitrary logic of the Guidelines, convictions from 1996 now
saddle him with six criminal history points, increase his offense level, and significantly
elevate his overall sentencing exposure. The Court should find that the Guidelines
substantially overrepresent his criminal history and account for that fact in determining a
sufficient sentence under § 3553(a).

       **2.     The Guidelines are not controlling in any event.**

       As the Court knows, the Guidelines are just one of many factors set forth in 18 U.S.C.
§ 3553(a) that a district court is to consider when imposing sentence. *See generally United States
v. Booker*, 543 U.S. 220 (2005). "Even where a district court has properly calculated the
Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular
defendant, and accordingly, must conduct its own independent review of the § 3553(a)
sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). Sentencing
necessarily involves an analysis of a complicated mix of factors, not a blind adherence to the

---

[1] The net impact on Mr. Brooks's offense level is one additional point. *See* PSR ¶ 56.

Honorable Margaret M. Garnett                          September 8, 2025
United States District Judge                              Page 6 of 10

Re:   United States v. Terry Brooks
      25 Cr. 73 (MMG)

Guidelines. The overarching command of § 3553(a) is that sentences be "sufficient, but not greater than necessary," to achieve the basic goals of retribution, deterrence and rehabilitation.

To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

### 3.    The remaining § 3553(a) factors support a 72-month sentence.

Considering the non-Guidelines § 3553(a) factors, the Court should sentence Mr. Brooks to 72 months' imprisonment. We address the most pertinent factors below.

*Mr. Brooks's history and characteristics.* We have shown that Mr. Brooks had a difficult childhood that led to an early turn to criminality and, eventually, incarceration. But after his release from prison in 2009 he committed to turning his life around, amassing an impressive record of hard work and law-abiding behavior. He turned into a loving partner, a laudable father, and a valued member of his community. In short, he proved he has the character to succeed under the right circumstances. His return to criminal conduct after that long stretch was disappointing, to say the least, but he can succeed again. As he writes in a letter to this Court: "I know I have many flaws, but dealing with this case and being here at MDC has pushed me to change and strive for growth. … Going forward, I want to focus on being a better man, not only for myself but for my daughter." Letter of Terry Brooks. Mr. Brooks's character thus supports our requested sentence.

*The seriousness of the offense, incapacitation, and deterrence.* Mr. Brooks's offenses were undeniably serious and he knows he is due a substantial sentence. But they are not unmitigated. He committed them at a time when he felt crushed beneath the weight of the deaths of multiple family members and a brutal family court case that was both

Honorable Margaret M. Garnett                    September 8, 2025
United States District Judge                         Page 7 of 10

Re:    United States v. Terry Brooks
        25 Cr. 73 (MMG)

psychologically and economically devastating. He sought psychiatric treatment and
medication to address his unrelenting stress, but eventually ceased treatment and turned to
illegal drugs to self-medicate. This of course caused him only to slide deeper into despair,
anxiety, and depression. It is against this backdrop that he reoffended.

Given these facts and the other equities, a 72-month sentence would be an appropriate
punishment. The Court should consider that Mr. Brooks's advanced age will make his time
in prison more arduous. As he enters his 60s with a raft of medical ailments that will likely
worsen over time—including asthma, hypertension, chronic back pain, and pre-diabetes,
PSR ¶¶ 121–22—he is less likely to receive adequate medical care within the BOP. *See* Office
of the Inspector General of the Department of Justice, *The Impact of an Aging Inmate
Population on the Federal Bureau of Prisons*, at i (2015; rev. 2016) ("We [] found that limited
institution staff and inadequate staff training affect the BOP's ability to address the needs of
aging inmates."), available at https://shorturl.at/mceZ1.[2]

His advanced age also makes him more likely to be victimized in prison. This is not
merely a theoretical concern—he has already been victimized at MDC. Earlier this year he
was moved to the SHU for his own protection after he was repeatedly extorted and
threatened by younger, gang-involved inmates. On that occasion the Government assisted in
helping him move to a different, safer unit. But the episode illustrates the difficulties
confronted by older, vulnerable inmates like Mr. Brooks, which are of course made worse by
the generally onerous conditions of confinement experienced by all. *See, e.g.*, Def.'s Bail Ltr.
at 3, Mar. 4, 2025, ECF 11 ("As of the writing of this letter, MDC has been on lockdown for
the past 10 days because of an outbreak of gang violence in the facility. During this time Mr.
Brooks has been served only cold food, denied showers, and deprived of social visits and
phone calls with his loved ones, among other indignities.") (internal citation omitted).

---

[2] His medical needs will also contribute to increased costs to the BOP. *Id.* ("[A]ging inmates
are more costly to incarcerate than their younger counterparts due to increased medical
needs."); *see also* Amicus Br. of Former BOP Officials Supporting Pet'r at 4, *Rutherford v.
United States*, No. 24-820 (U.S. filed Mar. 4, 2025) ("Aging, unhealthy inmates consume a
disproportionate share of BOP's scarce resources, which has cascading effects on federal
prison operations and the safety and security of BOP staff, as well as inmates.").

Honorable Margaret M. Garnett                    September 8, 2025
United States District Judge                          Page 8 of 10

Re:    United States v. Terry Brooks
         25 Cr. 73 (MMG)

On a brighter note, Mr. Brooks's age at the time he's released will make him less likely to reoffend. A 2017 Sentencing Commission study followed over 25,000 federal offenders released in 2005 for an eight-year period. The data showed that rearrests uniformly declined as age-at-release increased:



U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3 (Dec. 2017), https://shorturl.at/0jEqk. Of particular relevance here, the data showed that offenders aged 65 or older at the time of release had a rearrest rate of just 13.4%, compared to 67.6% for offenders younger than 21.

We acknowledge that this argument is somewhat complicated by the fact that Mr. Brooks committed his offenses here in his late 50s. But, first, he will be significantly older by the time he's released. And, second, prior to his current offenses he had gone 14 years without committing any crimes at all. His offenses here are therefore more properly considered anomalous than indicative of an inability to remain law-abiding. As his partner puts it: "Terry is not a violent man at his core. He severely decompensated under chronic, acute, persistent stress." Letter of Ady Ben-Israel. All told, then, Mr. Brooks's advanced age is a substantial mitigating factor that supports our requested sentence.

A 72-month sentence would also address general deterrence. It is a hefty sentence that would send a strong message to those tempted to engage in criminal conduct similar to Mr. Brooks's. This is especially true given that ample research shows that lengthier sentences are not correlated with increased deterrence. *See, e.g.*, *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that the certainty of being caught is a

Honorable Margaret M. Garnett                          September 8, 2025
United States District Judge                                Page 9 of 10

Re:   United States v. Terry Brooks
      25 Cr. 73 (MMG)

vastly more powerful deterrent than the severity of the punishment.") (cleaned up); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]he evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

   *The need for treatment.* This factor clearly supports a shorter prison term, as Mr. Brooks would receive more effective substance abuse and mental health treatment outside of prison. He is eager for such treatment, as he tells this Court: "I will continue living with my partner and commit to going to therapy regularly for the rest of my life. I also want to continue my mental health treatment and start drug treatment." Letter of Terry Brooks.

   *Unwarranted sentence disparities.* Our requested sentence would not create an unwarranted disparity, as it would be only modestly below the national average sentence of 108 months for defendants with the same Guidelines as Mr. Brooks. *See* JSIN Database, PSR 37–38. That modest reduction is amply justified by the mitigation discussed in this submission, including that the Guidelines overrepresent Mr. Brooks's criminal history in the first instance.

   *Restitution.* Finally, while restitution has yet to be determined, to the extent Mr. Brooks owes restitution he would be better able to earn money to pay it if he's not in prison. This factor therefore also supports a shorter period of incarceration.

—

Honorable Margaret M. Garnett                    September 8, 2025
United States District Judge                     Page 10 of 10

Re:  United States v. Terry Brooks
     25 Cr. 73 (MMG)

    Mr. Brooks accepts full responsibility for his crimes. He is remorseful, deterred, and committed to never offending again. For the reasons discussed in this submission, the Court should sentence him to 72 months' imprisonment. That sentence would serve to punish him for his wrongdoing while allowing him a meaningful chance at redemption when he is released. It would be sufficient, but not greater than necessary, to accomplish all sentencing aims.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

# EXHIBIT A

Dear Judge Garnett,

My name is Terry Brooks and I am a loving father, a committed partner, and a loyal friend. I am writing this letter in hopes of explaining my life so that you can get to know me better.

My childhood was all over the place. I was born and raised in Baltimore, Maryland as the only son and youngest out of 8 children. My parents separated when I was 5 years old because my dad cheated, and my mom was a strong woman. I had a good relationship with my dad and he was present my whole life, but my mom and my sisters were my everything. She was a foundational figure in my life. She taught me how to clean, cook, read, and how to take care of myself and work hard. She was a workaholic and went from scrubbing floors to becoming a principal at a high school to provide for us. She raised all 8 of us, her siblings, and her brother's children.

I was very rebellious at a young age because my mom wasn't there since she was always working. I didn't fully appreciate the amount of work she put into supporting us until I was older. I would make friends in the neighborhood and get in trouble a lot and my mom hated that. I was very close with my sisters and my uncle's children were also living with us while he was in the military. ███████████████████████████████████████████████████████████ ███  It was painful and more problems started in the house because of it. I moved around from place to place and I got involved with the system at 12 years old. I was put in juvenile until I was 15 and was then placed in foster care. I got stuck in the cycle and did 16 years in prison. I turned my life around in 2009, after I got out and my daughter J███ was born.

I came from doing 16 years in prison and I stayed off the streets. I cleaned bathrooms and offices, and sometimes I worked 2-3 jobs at a time, most recently working in maintenance and as a certified process server. I consistently worked to provide for my daughter and never looked back. I tried my best to build a healthy relationship with her and be a good co-parent even through all the challenges. I also met my partner, Ady Ben-Israel in 2019 and we quickly bonded. We started dating in 2020 and we have been living together for the past 3 years. She has been my biggest support system and I love her so much. We've made so much progress together: we got a house, moved in together, got a dog, and went on vacations.

At the same time, I've spent these years watching my loved ones pass away one by one, from my mother to my closest sister. It feels like the grief has been never ending, and yet I kept working and trying to push forward. Most recently, I buried my dad, who had brought me to New York to live with him. He was my hero. Losing him and my sister Andrea have made me realize that I don't want to waste any more precious time without my daughter. She is my whole world and I want to keep putting her first with every decision I make. I was raised by incredible, good women who taught me strong values that I want to pass down to my daughter if given the opportunity.

I know I have many flaws, but dealing with this case and being here at MDC has pushed me to change and strive for growth. I've mastered cooling myself down and not letting my emotions get the best of me because every day here is a life-threatening situation. I can only sleep when the doors are locked and my bunkie is taking medication. Since I've been here, I've been jumped twice and approached for extortion 3 times. The food is terrible, never served on time, and always cold. There is no safety or supervision here. I've seen inmates walking around with knives and phones, and there are riots. Two people got stabbed last night. And the lockdowns are never ending because the violence doesn't stop. I'm honestly just trying to keep myself mentally okay. I've been reading a lot on child psychology and mental health books since I felt very misunderstood growing up. I take medication for my severe depression but it's hard to get refills during the constant lockdowns. Since taking my medication, I feel more grounded and have spent time thinking about my future outside of this case.

Going forward, I want to focus on being a better man, not only for myself but for my daughter. First and foremost, I want to honor the way my mom raised me and set an example for J█████ as she becomes a young adult. I fought hard to build a relationship with her and I want to keep being a meaningful part of her life. It's important for me to grow and make good choices so I can be there to guide her. I plan on getting a job as soon as I get out and start saving money. I will continue living with my partner and commit to going to therapy regularly for the rest of my life. I also want to continue my mental health treatment and start drug treatment. Once I settle down, I want to start my fatherhood program again. I had a program where I help young men who just came out of prison build better parenting relationships with their children and the mothers of those children. I give them advice on how to handle responsibilities with children and be present in their kids' lives. I want the culture of men not helping men to change, and I think this program helps to break the cycle of fathers not being present in the lives of their kids. I'm very excited to get the program started again as I rebuild my relationship with my own daughter.

Your Honor, I sincerely regret my actions and if I could, I would take it all back. I have spent over a decade working and staying out of trouble. I don't bother nobody. I just want to raise my girl and go back home to my partner. I'm scared I'm going to die in prison alone with nobody. It feels like I lost my life and my whole world is gone. I can't drive my car, I can't see my daughter, I can't be with my partner, and I have no family here. I'm terrified of what will happen if I have to stay in prison for a long time. I ask that you give me the chance to be present with my loved ones as I get older.


Sincerely,
Terry Brooks

# EXHIBIT B

Honorable Margaret M. Garnett
United States District Judge
Southern District of New York

August 13, 2025

To Judge Margaret M. Garnett:

My name is Ady Ben-Israel. I am a licensed clinical psychologist in good standing in the State of New York and run a private practice in New York City. I am also Terry Brooks's life partner. The man sitting in judgement before you is not your average defendant. I plead with you to hear his story and have mercy on him, and on me, and give us both a chance to heal from the horrors of the past several years.

Terry comes from a rough background. He was born and raised in Maryland and faced many challenged throughout his childhood, including foster care placement, ███████████████, ████████████, and numerous housing displacements in childhood. He got caught up with the wrong people as a teen and got caught up in the system at a young age. Despite being in and out of jail, Terry turned his life around starting around 2009 after the birth of his daughter. He maintained employment and focused on being present in his daughter's life. He was highly respected at his long-term job and was in no legal trouble for over a decade.

Terry is a devoted and doting father to his daughter ██████. Terry takes every opportunity he can to spend quality time with ██████, despite her mother's efforts to obstruct this father-daughter relationship. Terry pays his child support consistently and punctually. In 2020, ██████ was able to spend Christmas with Terry and she organized an at-home karaoke night. Terry's apartment was equipped with a bed, extra clothing, and ample games that ██████ enjoyed. Fatherhood changed his life. His experience as a father led Terry to contribute to his community through organizing a support group for formerly incarcerated fathers of daughters. Terry also had a very positive relationship with his sister Andrea, who tragically passed away from cancer, and he relished their out-of-town Christmas visits. In 2019 Terry met me, and a very unlikely love story began, as we come from such divergent backgrounds. We met in 2019, started a relationship in 2020, and moved in together in 2022. Then the terror began.

Beginning in late 2020, a series of horrific events unfolded one after the other in our lives over four relentless years of acute stress. The financial, emotional, and safety threats we experienced were endless. Surviving the acute and persistent stress we experienced for several years nearly destroyed both Terry and me. For over two years in family court, ██████'s mother submitted dozens of alleged medical bills for medical procedures for ██████, all of which the court eventually determined were fraudulent. Nonetheless, for over two years Terry was required to pay extraordinary sums of money or risk going to jail. Because I sometimes struggled to get sufficient money to him in time, he experienced multiple detentions at Rikers Island.

At the same time, Terry was laid off from his long-term job in office building maintenance due to the building owners losing extensive rental income during the pandemic. Despite this hurdle, Terry worked hard to find another job and keep up his financial responsibilities with his daughter. He completed training and got certified as a phlebotomist. He then got certified as a process server and was taking higher-risk servings as these paid more. Many people are very upset when they are served legal documents and one man physically assaulted Terry, resulting in more legal bills and medical bills that the law firm he worked for refused to cover. Between these ups and downs with his employment, Terry experienced a painful string of family deaths. His stepmother in 2021, father in 2022, his beloved sister Andrea from breast cancer in 2022, his adult son Brandon from gun violence in 2023, and closest friend Teresa from brain cancer in 2024.

He was in a never-ending cycle of grief and despair, and it took its toll on him. He was not himself. Even though we are both people who can manage a lot of pressure, we both crumbled under the intensity and chronicity of the stress. Between that and his co-parenting difficulties, it was too much for one person.. After being informed of yet another motion that Claudia filed demanding money, the strain of the innumerable court appearances, arrests, and exorbitant fees we had already sustained, combined with Terry's shame and guilt about the chaos and financial burdens on me, Terry made two suicide attempts by overdose. Each time he required hospital stays of several days. Through all of this, Terry kept working. He made great efforts to earn money and reduce the massive financial stress I was carrying. He eventually worked day and night, getting dangerously little sleep, and relying on energy drinks (e.g. "Red Bull") to function. He was hospitalized on several occasions due to severe sleep deprivation as well.

Terry felt increasingly guilty about the chaos that his past brought into our relationship. He also felt even worse about his financial dependence on me during this time since the financial burdens involved with each tragedy fell on me.  As someone whose PTSD and severe depression had gone undiagnosed for so long, Terry was acutely vulnerable to decompensating under this unrelenting strain. It was in this context that he returned to the people and environment that he had once known and ultimately what led to this case. I believe this was his desperate, though deeply misguided, attempt to find a sense of competence, control, and mastery amidst the enormous chaos that our life had become. This eventually resulted in his arrest.

Terry is not the man that he was in his teens and early adulthood. He lived a stable, law-abiding, hardworking life in the decade before I met him. Despite his grave errors made under unremitting extreme stressors, Terry is worthy, capable, and motivated to get the mental health support he has needed for decades. Terry is 59 years old now and deeply regrets his actions and the position he's put himself in. We do not have a lot of time left together. When Terry met me, he began to live his life meaningfully for the first time. Up until then, he was largely emotionally shut down as this was the only way he knew to cope with the extreme suffering and lack of safety he had endured throughout his life.

Terry came to love me dearly, though early in our relationship he clearly lacked the skills needed to function healthfully in a relationship. To his enormous credit, he slowly opened himself up to getting psychiatric and psychological help that he had needed for decades. He came to greatly value the mental health skills and insights that he was learning. I clearly saw the progress he was making. Nonetheless, these supports proved insufficient in the face of the gargantuan pressures we were under. This is no surprise as I too broke under this pressure despite all my years of training, personal growth, skill development, and an intact support system.

Terry's remorse for the bad choices he made in the year prior to his arrest runs deeper than words can express. There is nothing he wants more than a chance at rehabilitation that he never received after his early-in-life incarceration. With me, doors opened to him that he never could have dreamed of. For the first time, he has a chance at a life in which healing, safety, stability are possible. He has a chance to live in a community of stable, hardworking, honest people. Terry would thrive if given the chance to course-correct and to heal from the PTSD and severe depression that have gone undiagnosed for so long. Terry is crystal clear that I will not stick around for more chaos, and he is steadfast in his resolve to become the reliable, law-abiding citizen and partner that he had been and that I know he can and will return to. His healthier, more grounded self comes through in every email and phone call I have with him. I wholeheartedly believe that Terry will *never* again do anything to risk losing the life we are building together. Making the leap from a world of hardship and threat to one of stability and care would have been a significant challenge under any circumstance. Amid a flood of overwhelming pressure, it became impossible.

Terry has shown that he is fully capable of profound personal growth—especially if given access to the mental health care he has long needed. He understands unambiguously that everything is at stake should he ever stray again from the path of honesty and lawfulness. His motivation to heal and change is strong and sincere. Even during these extremely difficult months in federal detention, Terry has committed himself to making the most of the resources available at MDC. He actively participates in the available therapeutic groups and earnestly engages with the mental health books I consistently send him. Each time we speak, I can hear the progress he is making.

Terry is not a violent man at his core. He severely decompensated under chronic, acute, persistent stress. He possesses a strong work ethic and a vast capacity to heal. I am fully committed to supporting him in his job search in any way I can. Living without him at home has been incredibly difficult for me. We are each other's only remaining family here in the U.S., and we moved in together with the hope of building a new life together. Unfortunately, the accumulation of overwhelming stressors precluded this. I firmly believe that, if given the opportunity, Terry will reestablish himself as a contributing member of society and fully embrace the supports available to heal from his past, while continuing to grow into a responsible citizen, father, and partner. He knows I will put up with *nothing* short of that.

Sincerely,


Ady Ben-Israel

# EXHIBIT C

[REDACTED]